UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x

UNITED STATES OF AMERICA

V.                                                                                    98 CR 927 (CM)

RAY ANTHONY RAMIREZ,

        Defendant.

----------------------------------------------------------x

### DECISION AND ORDER ON MOTION FOR COMPASSIONATE RELEASE

McMahon, J.:

    Ray Anthony Ramirez was sentenced to 48 years in prison for his role as leader of a criminal organization that distributed heroin and committed acts of violence, including personally participating in two murders. Ramirez is currently serving his sentence at FCI Schuylkill. He has served approximately 23 years of his 48-year sentence (without taking into consideration credit for good behavior, which would reduce his time served by approximately 15 percent). According to the Bureau of Prisons, his projected release date is June 29, 2039.

    Before the Court is Ramirez's motion for compassionate release filed pursuant to 18 U.S.C. §3582(c)(1)(A)(i), as amended by the First Step Act ("FSA"), P.L. 115-391.[1] Ramirez

---

[1] On December 14, 2020, Ramirez filed a *pro se* motion requesting modification of his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) (Docket No. 175). On January 13, 2021, the Government filed its response opposing the motion. (Docket No. 177). The Court then decided that it would assign counsel to represent Ramirez in connection with his motion. On May 7, 2021, assigned counsel filed a motion supplementing defendant's original *pro se* motion. (Docket No. 181).

1

argues that he should be resentenced to time served and released from custody because of: (1) his medical conditions (he is morbidly obese, diabetic, and has hypertension), which he believes puts him at risk of suffering serious illness if infected with the COVID-19 virus; (2) the harsh conditions of confinement created by the COVID-19 pandemic; (3) his young age at the time he committed his crimes; (4) the mandatory nature of the Sentencing Guidelines at the time of sentencing—which required a sentence at the statutory maximum of 48 years' imprisonment; and (5) his extraordinary rehabilitation while incarcerated.

The Government asks the Court to deny Ramirez's motion, arguing that (1) Ramirez has failed to demonstrate extraordinary and compelling circumstances justifying his release, and (2) even if he had demonstrated extraordinary and compelling circumstances, a reduction of his sentence would be inconsistent with the sentencing factors at 18 U.S.C. § 3553(a).

<u>The Factual & Procedural History of Ramirez's Crimes of Conviction</u>

Between in or around June 1996 and in or around July 1998, Ramirez was the leader of a drug trafficking organization that distributed large quantities of heroin in the vicinity of Bryant Avenue in the Hunts Point neighborhood of the Bronx (the "Bryant Avenue Organization"). (PSR ¶ 5, 22). The Bryant Avenue Organization distributed up to one kilogram of heroin per week (PSR ¶ 21) and sold as many as 700 bundles of heroin (each bundle containing 10 glassines) every other day. (PSR ¶ 99, 21-23). Ramirez admitted as part of his plea to distributing over 30 kilograms of heroin during the period of the conspiracy. (PSR ¶ 44).

As part of Ramirez's leadership of the Bryant Avenue Organization, he was also personally involved in two murders. On January 28, 1998, Ramirez was informed by other members of the Bryant Avenue Organization that another drug dealer named John Martinez

2

was selling drugs in the Bryant Avenue Organization's territory. Ramirez fired multiple shots at Martinez at point-blank range, killing him with a .38 caliber revolver. (PSR ¶ 45). In or around 1997, Ramirez learned that a rival drug dealer named Jesus Fornes had threatened another member of the Bryant Avenue Organization. Ramirez put out a contract to kill Fornes. On November 18, 1997, members of the Bryant Avenue Organization abducted Fornes, handcuffed him, placed a hood over his head, and brought Fornes to a location in the Bronx behind a strip club where the Ramirez and other members of the organization were waiting. Ramirez then instructed another member of the Bryant Avenue Organization to shoot and kill Fornes. (PSR ¶ 46).

Ramirez was arrested on July 22, 1998. On March 20, 2000, he pleaded guilty before the Honorable Robert W. Sweet, pursuant to a plea agreement, to a S2 98 Cr. 927 Superseding Information, charging him with two counts of conspiracy to commit murder in aid of racketeering, in violation of Title 18, United States Code, Section 1959 (Counts One and Two); one count of conspiracy to distribute heroin, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(C) (Count Three); and two counts of using a communication facility in commission of a drug offense, in violation of Title 21, United States Code, Section 843 (Counts Four and Five).

Pursuant to U.S.S.G. § 2A2.1, the plea agreement stipulated that the base offense level for Count One was 43 because the offense resulted in the death of the victim and constituted first degree murder. Pursuant to U.S.S.G. § 3B1.1, the plea agreement stipulated that a four-level enhancement applied because the defendant was the leader of the criminal organization or enterprise referenced in Count One. As a result, the adjusted offense level for Count One was 47. Pursuant to U.S.S.G. § 2A2.1, the plea agreement stipulated that the base offense

3

level for Count Two was 43 because the offense resulted in the death of the victim and the offense constituted first degree murder. Pursuant to U.S.S.G. § 3B1.1, the plea agreement stipulated that a four-level enhancement applied because the defendant was the leader of the criminal organization or enterprise referenced in Count Two. Pursuant to U.S.S.G. § 2D1.1(c)(1), the plea agreement stipulated that the base offense level for Counts Three, Four, and Five was 38 because the offenses involved the distribution and sale of more than 30 kilograms of heroin. Pursuant to U.S.S.G. § 2D1.1, the plea agreement stipulated that a two-level enhancement applied because the defendant possessed a firearm. Pursuant to U.S.S.G. § 3B1.1(a), the plea agreement stipulated that a four- level enhancement applied because the defendant was the leader of the narcotics conspiracy, and the conspiracy involved five or more participants. As a result, the adjusted offense level for Counts Three, Four, and Five was 44. Pursuant to U.S.S.G. § 3D1.4, the plea agreement stipulated that the combined adjusted offense level was 50. After taking into account a three-level reduction for acceptance of responsibility, the plea agreement stipulated a total offense level of 47. The plea agreement also stipulated that the defendant had zero criminal history points, resulting in a Criminal History Category of I. Based on these calculations, the advisory Guidelines range is life imprisonment, which exceeded the 48-year statutory maximum applicable on all counts of the Superseding Information. As a result, the plea agreement stipulated that the Guidelines sentence was 48 years' imprisonment. In the PSR, the Probation Office also found that the Guidelines sentence was 48 years' imprisonment. (PSR ¶¶ 51-82, 101).

On June 2, 2000, Judge Sweet issued a sentencing opinion similarly finding that the Guidelines sentence was 48 years' imprisonment. Because the sentencing took place before the Supreme Court's decision in *United States v. Booker*, 543 U.S. 200 (2005), the Court did

4

not have any discretion to depart from the Guidelines sentence. On June 6, 200, the parties appeared for sentencing. Judge Sweet criticized the structure of the drug trafficking laws and indicated that it would have granted a downward departure if it had discretion to do so.

> This sentence is a tragedy. You are going to spend your adult life in jail. If I were in a position to do it, I would downwardly depart, but I don't feel under all the circumstances that I can exercise my own beliefs and persuasions contrary to the dictates of the legislation and Congress. I guess what I will do is send the minutes of this proceeding to both judiciary committees in the hope that some way, somehow someone will recognize the human tragedy… I [impose the sentence] with much regret and a heavy heart. I can only say it's very difficult to look forward to the next … some 40 years, and say I hope something good comes out of it for you personally. Maybe you can figure out some way to make it make sense. I can't.

*See* Sentencing Transcript at 6-7 (attached as Exhibit B). Judge Sweet proceeded to sentence defendant to 48 years' imprisonment.

Compassionate Release

Under 18 U.S.C. § 3582(c), a district court "may not" modify a term of imprisonment once imposed, except under limited circumstances. One such circumstance is the so-called compassionate release provision, which provides that a district court "may reduce the term of imprisonment" where it finds "extraordinary and compelling circumstances." § 3582(c)(1)(A)(i). A motion under this provision may be made by either the Bureau of Prisons or a defendant, but in the latter case only "after the defendant has *fully exhausted all administrative rights* to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.* (emphasis added). Thus, where a compassionate release motion is brought by a defendant who has not "fully exhausted all administrative rights," the district court "may not" modify his term of imprisonment.

If a defendant demonstrates that he has exhausted his administrative remedies with the BOP, the Court must then consider whether the defendant has met his burden of establishing "extraordinary and compelling circumstances" warranting release.[2] In the past, this Court—and many of my district court colleagues—looked to United States Sentencing Guidelines § 1B1.13 (the applicable Guidelines section for sentencing reductions pursuant 18 U.S.C. § 3582(c)(1)(A)(i)), for guidance on what constituted "extraordinary and compelling circumstances."[3] That changed on September 25, 2020, when the United States Court of Appeals for the Second Circuit held that § 1B1.13 is not applicable to a motion brought by a defendant in the district court. *United States .v. Brooker* No. 19-32180-CR, 2020 WL 5739712, at *6 (2d Cir. Sept. 25, 2020). The Second Circuit reasoned that the language of § 1B1.13—language that has not been updated since the passing of the First Step Act—addressed only sentencing reduction motions initiated by the Bureau of Prisons. *Id.* In making clear that the district court was not constrained by the narrow grounds for granting compassionate release in § 1B1.13, the Second Circuit declared unequivocally that "district courts have discretion to consider the full slate of

---

[2] "A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue." *See, e.g., United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992).

[3] The Application Notes to Section 1B1.13 describe the circumstances under which "extraordinary and compelling reasons" exist. *See* § 1B1.13 comment (n.1). For example, the medical circumstances ground reads as follows:

(A)    Medical Condition of the Defendant—

    (i)    The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia

    (ii)    The defendant is—
        (I)    suffering from a serious physical or medical condition,
        (II)    suffering from a serious functional or cognitive impairment, or
        (III)    experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self- care within the environment of a correctional facility and from which he or she is not expected to recover.

*Id.* § 1B1.13 comment (n.1).

extraordinary and compelling reasons that an imprisoned person might bring before [the court] in motions for compassionate release," and that "neither Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion." *Id* at *7.

What *Brooker* did not change, however, is the mandate in § 3582(c)(1)(A)(i) that a court contemplating a defendant's release pursuant to that section must first consider the sentencing factors at 18 U.S.C. § 3553(a), to the extent they are applicable, and determine whether they counsel for or against release. A court may still deny compassionate release where the § 3553(a) factors override, in any particular case, what would otherwise be extraordinary and compelling circumstances.

<u>Ramirez Exhausted his Administrative Remedies in the Bureau of Prisons</u>

On August 18, 2020, the defendant submitted a request for a reduction in sentence to the Warden of FCI Schulykill, which was denied on September 8, 2020. Accordingly, Ramirez has exhausted his administrative remedies, and the present motion for compassionate release is properly before the Court.

<u>The Motion Before the District Court</u>

Ramirez argues that he should be resentenced to time served and released from custody because of: (1) the COVID-19 pandemic and the possibility that—in light of his medical conditions—he is at risk of suffering serious illness if infected; (2) the harsh conditions of confinement created by the COVID-19 pandemic; (3) his young age at the time he committed his crimes; (4) the mandatory nature of the Sentencing Guidelines at the time of sentencing—which required a sentence at the statutory maximum of 48 years' imprisonment; and (5) his extraordinary rehabilitation.

*Ramirez's Medical Condition*

There is no dispute that Ramirez is morbidly obese, diabetic and suffers from hypertension. *See* Defendant's Supplemental Motion, Ex. A (excerpt from defendant's BOP medical records). There is also no dispute that the each of these conditions has been identified by the Centers for Disease Control as being potential risk factors for serious illness from COVID-19.[4] However, Ramirez has received the Pfizer COVID-19 vaccine. As several courts have concluded, the risk of COVID-19 for a vaccinated individual is substantially reduced to the point that a defendant will typically not be able to demonstrate extraordinary and compelling reasons after he has been vaccinated. *See, e.g.*, *United States v. Mena*, No. 16 CR. 850 (ER), 2021 WL 2562442, at *3 (S.D.N.Y. June 23, 2021) ("Access to an approved COVID-19 vaccine generally counsels against compassionate release based on COVID risk, due to the strong evidence of the effectiveness of each of the vaccines."); *United States v. Santana*, No. 18-CR-865 (VEC), 2021 WL 1819683, at *2 (S.D.N.Y. May 6, 2021) (finding no extraordinary circumstances due to "the efficacy of the COVID vaccines, and specifically the Pfizer vaccine" and citing data showing Pfizer vaccine is 94% effective against COVID-19 hospitalization); *United States v. Orlandez-Gamboa*, No. 99 CR. 654 (CM), 2021 WL 2582077, at *3 (S.D.N.Y. June 23, 2021) (finding defendant had failed to demonstrate extraordinary and compelling circumstances, even though he was in high-risk age group, because he was "fully vaccinated against COVID-19"). Indeed, recent data confirms that the COVID-19 vaccines dramatically reduce the risk of death or serious illness from the various variants of COVID-19, even the dreaded Delta Variant.[5]

---

[4] https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/underlying-evidence-table.html.
[5] Vaccines in the US are highly effective, including against the Delta variant

Ramirez argues that notwithstanding his having been vaccinated, "the risks associated with contracting COVID- 19 remain significant, . . . and at best the vaccines only offer temporary protection; we will likely be confronted with the same question many times during the duration of Ramirez's sentence." To that I say, there will be booster shots made available, especially for individuals like Ramirez, who are at high risk from suffering a severe outcome should they contract the virus.

*COVID-19 & FCI Schuylkill*

As for the state of COVID-19 at FCI Schuylkill, even during the latest uptick of COVID cases around the country (mostly attributed to the "Delta" variant), the institution is currently reporting zero inmates testing positive for the virus. *See* BOP COVID-19 Dashboard, https://www.bop.gov /coronavirus/ (last visited November 8, 2021). Moreover, 805 of the approximately 1,025 inmates at FCI Schuylkill have been fully vaccinated. *Id.*

Regarding the admittedly harsh conditions of confinement created by the COVID-19 pandemic, the Court acknowledges that in most instances, a person is probably better off at liberty in the community during a pandemic, then incarcerated in a federal prison.

---

- **The COVID-19 vaccines approved or authorized in the United States are highly effective at preventing severe disease and death, including against the Delta variant.** But they are not 100% effective, and some fully vaccinated people will become infected (called a breakthrough infection) and experience illness. For all people, the vaccine provides the best protection against serious illness and death.
- Vaccines are playing a crucial role in limiting spread of the virus and minimizing severe disease. Although vaccines are highly effective, they are not perfect, and there will be vaccine breakthrough infections. Millions of Americans are vaccinated, and that number is growing. This means that even though **the risk of breakthrough infections is low,** there will be thousands of fully vaccinated people who become infected and able to infect others, especially with the surging spread of the Delta variant. Low vaccination coverage in many communities is driving the current rapid surge in cases involving the Delta variant, which also increases the chances that even more concerning variants could emerge.

https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html?s_cid=11504:delta%20variant%20and%20 vaccine%20effectiveness:sem.ga:p:RG:GM:gen:PTN:FY21(Emphasis added).

That said, these harsher conditions of confinement are not unique to the defendant, *i.e.*, "extraordinary" for purposes of § 3582(c). *See United States v. Bryant*, 2021 WL 738838, at *3 (S.D.N.Y. Feb. 24, 2021) (explaining that the severe conditions of confinement during the pandemic are "not unique to Mr. Bryant and do not militate strongly in favor of finding there are extraordinary and compelling reasons for a sentence reduction"). If the challenging conditions of confinement caused by the pandemic warranted a sentence reduction here, essentially every inmate who has been in BOP custody at any time since March 2020 would be entitled to a sentence reduction.

Concerning BOP's ability to attend to Ramirez's medical conditions, his medical records indicate that he is receiving regular medical care and that the BOP medical staff at FCI Schuylkill are capable of managing his diet, blood pressure and diabetes.

In sum, Ramirez has failed to demonstrate that his current medical condition and the threat of contracting COVID-19 at the FCI Schuylkill, alone, present extraordinary and compelling circumstances warranting his immediate release.

> *Ramirez's Young Age at the Time of Crime, Mandatory Sentencing Guidelines at time of Sentence & Extraordinary Rehabilitation While Incarcerated*

In addition to his medical condition, COVID-19, and prison condition arguments, Ramirez contends that the Court should grant him compassionate release to redress his overly-harsh sentence. He argues that he was but a 19 years old impulsive adolescent when he committed the crimes of conviction; a fact that the sentencing court recognized, but lamented being powerless to take into account because of the mandatory Sentencing Guidelines in effect at the time of sentencing—Guidelines that mandated a 48 years' term of imprisonment. Ramirez says that his conduct and actions while incarcerated over the past two decades

demonstrate that he has matured and is now fully rehabilitated, and no longer a danger to the community.

Post *Brooker*, the Court has broad discretion to consider reasons beyond those listed in the Sentencing Guidelines, including *inter alia* "the severity of [the defendant's] sentence," *United States v. Vargas*, No. 88 Cr. 325, 2020 WL 6886646, at *6 S.D.N.Y. Nov. 24, 2020, and the defendant's "age at the time of his crime and the sentencing court's statements about the injustice of his lengthy sentence." *Brooker*, 976 F.3d at 238; *see also* See S. Rep. No. 98-225, at 55-56 (1984) (noting that reduction may be appropriate when "other extraordinary and compelling circumstances justify a reduction of an unusually long sentence"; *United States v. Maumau*, No. 2:08-CR-00758-TC-11, 2020 WL 806121, at *6-*7 (D. Utah Feb. 18, 2020) (further discussing this history and collecting cases where district courts have reduced sentences in part because they were overly long).

Where "no single factor alone" may justify release, the total circumstances may still rise to the level of extraordinary and compelling reasons for release. *See Vargas*, 2020 WL 6886646, at *1 (finding that, in combination, the defendant's rehabilitation, harsh sentence, medical issues, the pandemic, and intention to care for his mother were extraordinary and compelling reasons). And where a defendant's grounds for compassionate release warrant a reduction in sentence, but not necessarily immediate release, a sentence reduction is an available option for the court. As the Second Circuit has explained, "compassionate release is a misnomer. [The First Step Act] in fact speaks of sentence reduction. A district court could, for instance, reduce but not eliminate a defendant's prison sentence." *Brooker,* 976 F.3d at 237.

11

The defense argues that recent developments in neurologic science suggests that when Ramirez committed his offenses as a 19-year-old, he was neurologically more likely to focus on the potential rewards of a decision than on the possible costs or downfalls:

> While a deeper understanding of the adolescent brain does not excuse Ramirez's behavior, it offers a context into which one can better understand his poor judgment and decision making. Ramirez's maturation and rehabilitation while in custody supports this research suggesting that youthful offenders demonstrate a great capacity for maturation throughout their early 20s. Ramirez was a juvenile when the conspiracy began and still a teenager when the VICARs [(Violent Crimes in Aid of Racketeering)] occurred.

Defendant's Letter Motion, Doc 181, at 12. Moreover, defendant argues, because his sentencing took place during the pre-*Booker* era, the sentencing court was compelled to impose an inappropriate sentence for an adolescent offender:

> Although none of the offenses to which he pled guilty had statutory maximums over 20 years, Ramirez's entered into a plea that resulted in the 48-year mandatory, pre-*Booker* Guideline sentence. . . . Judge Sweet expressed great remorse that he had no discretion to downward depart from the Guidelines. Had Ramirez's sentencing occurred less than five years later, after *Booker*, Judge Sweet would have almost certainly downwardly departed. Now, with the benefit of Ramirez's extraordinary and compelling post-conviction rehabilitation, a sentence well below the Guidelines is appropriate. Moreover, the past 23 years overwhelming suggests Ramirez is not a danger to the safety of any other person or the community.

*Id.*

Defendant directs the Courts attention to District Court Judge Jed R. Rakoff's decision in *United States v. Ramsay*, 96 Cr. 1098 (JSR), 2021 WL 1877963 (S.D.N.Y. May 11, 2021), in support of his argument that the Court has the authority to reduce, and should reduce what even Judge Sweet believed to be defendant's overly harsh sentence. Letter by Steven Turano, attaching *Ramsay* decision, Docket No. 182. In *Ramsay*, the defendant was ordered by a leader of the Crotona Avenue Boys to shoot and kill the

12

leader of a rival gang, and the defendant followed orders by committing the shooting, which ultimately resulted in two innocent individuals being shot and killed. *Id.* at 1. Ramsay was convicted of murder in aid of racketeering after a trial and sentenced to a mandatory minimum term of life imprisonment. *Id.* at 9.

Ramsay filed a compassionate release motion asking Judge Rakoff to reduce his mandatory life sentence based on his young age when he committed his crimes and the mandatory Guidelines in place at the time of sentencing. After *inter alia* an extended scholarly discussion of "society's evolving understanding of the adolescent brain" *vis-a-vie* adolescent criminal culpability, Judge Rakoff reduced Ramsay's life sentence to a term of 30 years' imprisonment, factoring in his young age at the time of the murder, difficult upbringing, rehabilitation in custody, and the fact that he was sentenced to a mandatory minimum term of imprisonment. *Id.* at 35-47. The Court remarked that the shooting had "all the hallmarks of adolescent crime: a split-second, hot-headed choice made in the presence of peers." *Id.* at 36.

In the present case, Ramirez was—in contrast with Ramsay's mere membership position in the Crotona Avenue Boys—the *leader* of the Bryant Avenue Organization, which sold large quantities of glassines containing heroin, sometimes amounting to over a kilogram of heroin each week. At his plea proceeding, Ramirez admitted that his participation in the Bryant Avenue Organization involved the distribution of at least 30 kilograms of heroin— representing hundreds of thousands of individual doses of heroin that were distributed to drug addicts. In addition to this large-scale drug trafficking, Ramirez also personally participated in two different murders as part of his involvement in the Bryant Avenue Organization. In January 1998, he personally shot and killed a rival

drug dealer named John Martinez by shooting him multiple times at point-blank range. In November 1997, he ordered other members of the Bryant Avenue Organization to shoot and kill another rival drug dealer named Jesus Fornes after Fornes was kidnapped, cuffed, and brought to an alley behind a strip club in the Bronx. Thus, Ramirez's repeated and calculated decisions to engage in dangerous criminal activity over several years—including participation in two different murders—distinguishes his crimes from the "split-second" and "hot-headed" crime committed by Ramsay.

*Ramsay* also differs from the present case, in that the sentence Judge Rakoff originally imposed on Ramsay was different from the sentence Judge Sweet imposed on Ramirez. In *Ramsay*, the defendant was convicted after trial of murder in aid of racketeering, which carried a mandatory minimum sentence of life imprisonment—a sentence that would never allow Ramsay to be released from custody. By contrast, Ramirez was allowed to plead guilty to offenses that capped his potential exposure to 48 years' imprisonment, instead of the life sentence that the Guidelines would have otherwise required. Taking into account Ramirez's ability to accrue good time credits, he has the opportunity to be released after approximately 41 years in custody.

That said, Judge Sweet believed that the 48 years sentence he was obliged to impose was tragic in the circumstances and that, had he the power, he would have downwardly departed. Why did Judge Sweet feel that way? After all, Ramirez was looking at the death penalty for the two murders he committed in furtherance of the drug trafficking organization, before the Government relented, and the parties worked out a plea deal that also spared him a sentence of life in-prison. The answer, I believe, can be

14

found in the Presentence Investigation Report that the Probation Department provided to Judge Sweet at the time of sentence.

From an extremely young age, Ramirez's life revolved around drug abuse and neglect. Ramirez's father, a long-time substance abuser, died from AIDS in 1992, when Ramirez was 14 years old. *See* Presentence Report ("PSR") at ¶ 89 (attached as Exhibit E). His most enduring memory of their relationship was the guilt he experienced when he refused his father's pleas to pull the intravenous tubes to end his father's suffering. Ramirez's mother also abused drugs until she herself contracted the HIV virus in the late 1990s. From an early age, Ramirez was affected by his mother's drug use and street life.

After his father's death, Ramirez's mother married a man who physically abused Ramirez, his siblings, and his mother. *Id* at ¶ 86 (Ramirez "recalled that [his stepfather] often handcuffed [his] mother and locked [his siblings] up while beating [] Ramirez." [He] recalled [his stepfather] soaking a belt with alcohol and beating [he and his siblings] with it"). Ramirez would observe his mother "on the street" working as a prostitute. *Id.* at ¶ 87. In his early teens, Ramirez went to live with his grandmother after his stepfather committed suicide and his mother was incarcerated for a drug conviction. *Id.*

Ramirez himself started abusing drugs and alcohol. "[F]amily members" first provided him with alcohol and marijuana when he was only 8 years old. *Id.* at ¶ 94. By age 10 he was "getting drunk and high frequently" and by age 14 "drinking heavily." *Id.* At the time Ramirez committed his crimes, he was abusing cocaine, crack, LSD, heroin, and alcohol to "escape depression." *Id.* He dropped out of school at age 15 (*see* PSR at ¶ 95). And, quite remarkable, in a notorious sense, Ramirez would ascend quickly into a

15

leadership role of a drug-trafficking organization comprised mostly of older men—dealing in large quantities of drugs and committing drug related murders.

While Ramirez terrible upbringing does not in any way excuse his drug dealing and murders, it does explain how he came to "choose" the path he did. Likely, it was the awful tale of Ramirez young life that led Judge Sweet to believe a prison sentence of 48 years to be—by some degree—too long; that such a young man was capable of redemption, and should be afforded some level of mercy, beyond the 48 year plea deal he was offered.

For his part, Ramirez has taken advantage of the programming and services offered to him by the Bureau of Prisons. His transcripts from Schuylkill and USP Lewisburg document his successful completion of nearly seventy courses. In addition, he obtained his GED, has taken several years of college-level classes, and taken occupational training classes.[6] *See* Ramirez's transcript and course completion certificates, Defendant's Motion, Exhibit F. In total, Ramirez reports having completed over 4,600 hours of accredited programs, countless hours of self-study, and 13 years employed by UNICOR. While in UNICOR, Ramirez received his ISO internal auditor certification,[7] increasing the chances that he will find employment in the manufacturing sector upon his release. *See Id,* Exhibit G. His current UNICOR supervisors have submitted exemplary performance recommendations and share the belief that he is highly

---

[6] UNICOR is the trade name for Federal Prison Industries, a wholly owned government corporation whose mission is to prepare inmates for successful reentry through job training. UNICOR assists offenders with acquiring marketable job skills so that they can one day become law-abiding, contributing members of society.
[7] The ISO family of quality management systems ("QMS") is a set of standards that helps organizations ensure they meet customer and other stakeholder needs within statutory and regulatory requirements related to a product or service. ISO deals with the fundamentals of QMS, including the quality management principles that underlie the family of standards. ISO deals with the requirements that organizations wishing to meet the standard must fulfil.

employable. *See Id.,* Exhibit H. Ramirez has also spent years participating in programs to help his fellow inmates, including M.E.N. of Influence (an inmate facilitated self-improvement and pre-release program assisting inmates to become law-abiding citizens) and the Suicide Watch Companion Program. *See Id.,* Exhibit I.

Ramirez received years of drug treatment and psychological counseling, including many hours of self-improvement courses and individual and group therapy. *See Id.,* Exhibit J. One of Ramirez's drug counselors at Lewisburg, Richard Whitmare, MSW, LCSW, prepared an extraordinary progress report, dated October 19, 2010: "[Ramirez's] time served has been very telling as exemplified by his pro-social conduct, rehabilitative accomplishments, selfless service to others, and exceptional programmatic achievements. … there are inmates and institutions benefitting in a substantial way from the positive ripple effect being generated as a result of [his] pro social [] and positive initiative. I am confident he will have an even greater positive impact on is fellow man upon his return to the community."

Also included as part of Ramirez's compassionated release presentation is a book of poems that he has written, that were published in 2013. *Id.* at Exhibit L. Ramirez's poems are mostly wistful, dark reflections on his sad predicament; but his work also suggests a person on a spiritual journey of redemption.

> Suffering, a firestorm of painful experiences;
> A scourge of mental flesh, singeing the mind,
> Collapsing order into chaos of unmaking;
> Reduced to the elements of being;
> New urge divine igniting the flame within,
> Calling forth a dragon born anew, redeemed;
> Chaos stilled by the reflection of order,
> A pattern complex given unto man for self-domination;
> Redemption found in spiritual rebirth. In nature brought forth,
> For the illumination of man by the flame;

> Fire of gods given unto man for self-dominion;
> Redemption found in spiritual rebirth.

*See e.g. Id.* at Exhibit L, "Phoenix Paragon," by Ray Anthony Ramirez.

Ramirez appears to have accepted Judge Sweet's challenge at sentencing that he "figure out some way to make [his 48 years in prison] make sense"

The Government counters that, any rehabilitation claim by Ramirez is undermined by four disciplinary infractions since 2000, including two infractions since 2015: an August 2015 incident where he was insolent to a staff member, and a September 2017 infraction for possession of gambling paraphernalia. The Court is unmoved by the Government's argument that such minor infractions—an apparent argument with a staff member on one occasion, and gambling on one occasion—over these many years undercuts the mountain of documentation that defendant has produced to show he is a changed person and ready to live as a law abiding citizen in the community.

The stronger argument the Government makes is that a sentence reduction in this case would be inconsistent with the sentencing factors set forth in 18 U.S.C. § 3553(a). Indeed, the nature and circumstances of the offenses in this case are among the most serious that have come before this Court. Ramirez was a leader in the Bryant Avenue Organization that sold large quantities of dangerous and addictive drugs in the Hunts Point Section of the Bronx. During his leadership, the organization sold over 30 kilograms of heroin. Even more egregious, Ramirez participated in two separate murders— including a murder where he ordered other members of the Organization to shoot and kill the victim after he had been kidnapped, cuffed, and brought to an alley behind a strip club. Each of these crimes considered separately would have warranted a

very lengthy term of imprisonment; considered together, this Court cannot say that a sentence of 48 years' imprisonment was necessarily unreasonable.

Notwithstanding the seriousness of the offenses, Judge Sweet believed that the history and characteristics of the young man who stood before him mitigated against a sentence of 48 years in prison. Ramirez had endured an abusive upbringing that scarred him both mentally and physically. Judge Sweet believed, no doubt, that a defendant who commits his crimes at such a young age and after enduring such abuse, is capable of redemption and should be afforded some measure of mercy. Judge Sweet expressed great remorse that he had no discretion to downward depart from the Guidelines. Had sentencing occurred less than five years later, after *Booker*, Judge Sweet would have almost certainly downwardly departed.

Thus the question for the Court in considering the present motion: Should the Court find that Ramirez's "age at the time of his crime and [Judge Sweet's] statements about the injustice of his lengthy sentence," viewed in light of Ramirez now demonstrated rehabilitation, (*see Brooker*, 976 F.3d at 238), constitutes an extraordinary and compelling reason to reduce his sentence on compassionate grounds?

Given Judge Sweet's expressed belief that Ramirez was redeemable and that his young age mitigated against the long sentence he was constrained to impose, and in light of Ramirez's extraordinary post-conviction rehabilitation, the Court will grant defendant's motion to the extent that his sentence will be reduced by eight years. While this may not reflect the downward departure Judge Sweet contemplated, it is as far as this Court is prepared to go. Notwithstanding Ramirez's dreadful upbringing, his young age when he committed his crimes, and rehabilitation, forty years in prison is as low as this

Court will go for this twice murderer. The Court will issue an amended judgment reflecting the sentence reduction.

This constitutes the decision and order of the Court.

Dated: November 9, 2021

_____
Colleen McMahon
United States District Court Judge